

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AB:CMP
F. #2010R00449

*271 Cadman Plaza East*
*Brooklyn, New York  11201*

April 22, 2010

VIA ECF AND FAX

The Honorable Ramon E. Reyes
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:  United States v. Ozoda Djalilova and Levy Sharon
            Magistrate Docket No. 10-457

Dear Judge Reyes:

       On April 21, 2010, United States Magistrate Judge Lois Bloom authorized the arrests of the above-referenced defendants on the charge of conspiring to make a false statement in an immigration document; specifically, as detailed in the complaint, the defendants entered into a sham marriage and purported to be husband and wife to enable Ozoda Djalilova to obtain permanent resident status.  Djalilova also falsely stated that she had not, within the past ten years, procured anyone for prostitution and that she did not intend to engage in such activities in the future, when, in fact, she ran and continues to run a prostitution business in Brooklyn.

       The government respectfully submits that both defendants pose a danger to the community and therefore a permanent order of detention is warranted.  In addition, Djalilova is a significant flight risk and should also be detained on those grounds.

<u>Proffer</u>

The government proffers the following facts concerning the charges at issue and pretrial detention. <u>See</u> <u>United States v. LaFontaine</u>, 210 F.3d 125, 130-31 (2d Cir. 2000) (the government is entitled to proceed by proffer in a detention hearing); <u>United States v. Ferranti</u>, 66 F.3d 540, 542 (2d Cir. 1995) (same); <u>United States v. Martir</u>, 782 F.2d 1141, 1145 (2d Cir. 1986) (same). These facts are relevant to the factors to be considered in the detention analysis under the Bail Reform Act, particularly the history and characteristics of the defendants, and the seriousness of the danger posed by the defendants' release. <u>See</u> 18 U.S.C. § 3142(g).

I.   <u>History and Characteristics of the Defendants</u>

   A.   <u>Ozoda Djalilova</u>

Djalilova is a citizen of Uzbekistan, a country with which the United States does not have an extradition treaty, and is actively involved in varied criminal activity. As detailed in the Complaint, she has been communicating voluntarily with law enforcement for several months. She has admitted to committing immigration fraud – in addition to her own fraudulent permanent resident application, she is associated with a corrupt airport employee at John F. Kennedy International Airport, whom Djalilova pays $600 in order to obtain extended admittance stamps for Uzbek citizens arriving in the United States. The Complaint details her prostitution business, and several witnesses have confirmed that Djalilova has her own 14-year old daughter posting ads on the Internet and checking to make sure that customers entering the building were not undercover police.

Djalilova has also admitted to being involved in extensive check cashing schemes. Most recently, she traveled to Dubai on April 6, 2010 and, according to her own statements, met with Uzbek nationals seeking her assistance in cashing $3 million in worthless checks at banks in the United States. As the result of a search warrant conducted at her residence this morning, the government obtained numerous checkbooks in others' names and other evidence of check fraud and bank fraud.

B.  <u>Levy Sharon</u>

Sharon was born in Azerbaijan and was naturalized as a United States citizen in 1988.  He is an auxiliary police officer assigned to the 62nd Precinct in Brooklyn.  Djalilova paid him approximately $30,000 to enter into their fraudulent marriage.  As described in the Complaint, he participates in Djalilova's prostitution business by transporting prostitutes across state lines to Atlantic City and Foxwoods casinos.

Perhaps most troubling, Sharon uses his NYPD uniform for purposes of profit and intimidation.  Multiple witnesses have stated that Djalilova pays Sharon approximately $400 a month in protection money for her prostitution business, and that Sharon regularly enters the business location at 1985 Ocean Avenue in uniform and checks the prostitutes' immigration documents – a tacit threat of deportation should they ever report him and Djalilova to the authorities or otherwise anger them.

II. <u>Seriousness of the Danger Posed by the Defendants' Release</u>

Sharon and Djalilova have waged a campaign of intimidation against the witness to their fraudulent marriage, Djalilova's ex-boyfriend, who is identified as John Doe in the Complaint.  John Doe has consensually recorded numerous threatening phone calls and voice mail messages left by both defendants.  A draft transcript, translated from the original Russian, is attached hereto as an exhibit.[1]  In this conversation, which was recorded last week, Sharon repeatedly demanded in exceptionally vulgar language that John Doe come to see Sharon, and John Doe refused.  Sharon threatened, "I'll cut your [UI] up.  I'll cut your wife up.  I'll cut your mother-in-law."[2]

The defendants' threats against John Doe escalated earlier this week.  Djalilova told the FBI that Sharon planned to plant a weapon on John Doe so that John Doe would be arrested and deported.  What Djalilova failed to reveal, however, was that she

---

[1]   In the transcript, Sharon is identified as "RM" (for "Russian Male") and John Doe is identified as "CHS" ("confidential human source"). This is a draft translation and transcript and therefore subject to future revision.

[2]   Sharon appears to have a violent history; he was arrested in 2000 for throwing hot water at his ex-wife, causing first and second degree burns on her head, shoulder and back.

3

was an active participant in this plot. On Monday, April 19, 2010, Djalilova and Sharon drove to John Doe's home and called from their car to demand that he meet with them. When John Doe refused, Sharon went up to John Doe's apartment, and when John Doe opened the door, Sharon threw what appeared to be a gun inside John Doe's apartment. Witnesses who were in the car with Sharon and Djalilova believed it was a real gun. John Doe immediately notified the FBI and was waiting for them to escort him to the nearest police precinct to turn over the weapon when he was arrested by the NYPD based on a 911 call made by Sharon, just as Sharon and Djalilova had planned.

Later that evening, Sharon made a false written statement with the 61st Precinct, alleging that John Doe had pointed a "black firearm" at Sharon. Then, on April 21, 2010, Sharon and Djalilova filed another false report with the NYPD, claiming that John Doe had called Djalilova and threatened to kill her. In fact, John Doe was making a consensually recorded call to Djalilova under the supervision of the FBI, and no such threats were made.

Under the Bail Reform Act, 18 U.S.C. §§ 3141 et seq., federal courts must order a defendant's pre-trial detention upon determining that "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community[.]" 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. See Chimurenga, 760 F.2d at 405.

As described above, the defendants' obstructive conduct alone poses a serious danger to the community. See 18 U.S.C. § 3142(f)(2) (the Court may require a detention hearing if there is a serious risk that the defendants will flee or "obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure or intimidate, a prospective witness"). In United States v. LaFontaine, 210 F.3d 125 (2d Cir. 2000), the district court revoked the defendant's bail based on evidence that she had sought to influence witnesses. The defendant, who was charged with non-violent crimes such as mail fraud, health care fraud and witness tampering, appealed, arguing that elaborate release conditions, including relocation to a different state, would assure the safety of the community. Id. at 135. The Second Circuit rejected this argument, finding that although "LaFontaine is a white-collar criminal with no

4

connection to the mob ... [and] the evidence of tampering does not include either actual violence or threats of violence against any trial witnesses," detention was still appropriate: "First, we have held that a record of violence or dangerousness in that sense is not necessary to support pretrial detention. Second, obstruction of justice has been a traditional ground for pretrial detention by the courts..." Id. at 134 (internal citations omitted). Moreover, the Court noted that in United States v. Gotti, 794 F.2d 773, 779 & n.9 (2d Cir. 1991), even a "single incident of witness tampering constituted a 'threat to the integrity of the trial process...' and was sufficient to revoke bail." LaFontaine, 210 F.3d at 134 (quoting Gotti, 794 F.2d at 779 n.5).

  Here, the ease with which the defendants have threatened and intimidated John Doe and manipulated law enforcement to do their bidding demonstrates just how dangerous they would be if released. At the very least, John Doe's life and liberty would be put at risk if they were released. Moreover, Sharon's regular abuse of his status as an NYPD auxiliary officer to benefit himself and protect Djalilova's illegal prostitution business makes him exceptionally dangerous, as it is very likely that he will continue to use his status to threaten other witnesses, most of whom are Uzbek and Russian citizens fearful of deportation.

  Even electronic monitoring and a significant bail package would not be sufficient to ensure the safety of the community. The Second Circuit has repeatedly held that even elaborate conditions of home detention cannot substitute for incarceration where the defendant is violent or cannot be trusted to comply with the conditions of release. See United States v. Dono, Nos. 07-5333-cr(L), 07-5334-cr(CON), 2008 WL 1813237 (2d Cir. April 23, 2008) (overturning district court decision to authorize pre-trial release for defendants who participated in violent crimes, finding that the conditions imposed by the District Court – including bonds for the two defendants in the amounts of $2 million and $3 million, home detention, electronic monitoring, wiretapping family members' phones and a prohibition on contact with organized crime family members – were still insufficient to ensure the defendants' compliance with the terms of their pretrial release). In Dono, the Court found that in light of the defendants' violent criminal acts and their intimidation of victims and witnesses, "the idea that 'specified conditions of bail protect the public more than detention is flawed' because, among other reasons, '[t]hese conditions would at best elaborately replicate a detention facility without the

confidence of security such a facility instills.'" Id. (quoting United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993)).

As in Dono, electronic monitoring of Djalilova and Sharon could not prevent them from directing others to influence or intimidate witnesses, particularly in light of the vulnerable nature of the witnesses, many of whom are prostitutes who are here illegally.  Given the defendants' recent obstructive conduct and their repeated lies to law enforcement, there is no condition or combination of conditions that would "reasonably assure the safety of any other person and the community," 18 U.S.C. § 3142(e), or that they abide by the orders of this Court.

### III. Djalilova Poses a Significant Risk of Flight

As described above, Djalilova is a citizen of Uzbekistan, and her four-year old daughter, mother and the rest of her family live there.  She also has a connection with a corrupt JFK employee who could quite possibly facilitate her flight out of the United States.  Because the United States does not have an extradition treaty with Uzbekistan, it would be impossible to secure her return.  In addition, she has recently traveled to the United Arab Emirates (Dubai), which also has no extradition treaty with the United States.  Knowing that she will almost certainly be deported as a result of her arrest on the instant immigration charges, Djalilova has no incentive to remain in the United States; consequently, no combination of conditions could secure her attendance in court.

### Conclusion

For the reasons cited above, the government respectfully requests that the Court enter a permanent order of detention with respect to the defendants Ozoda Djalilova and Levy Sharon.

Respectfully submitted,

BENTON J. CAMPBELL
United States Attorney

By:   /s/ Cristina Posa
Cristina Posa
Assistant U.S. Attorney
(718) 254-6668